UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATASHA VAN DUSER, JACKSON LEA, CHARLOTTE MASON, TRISTAN HSU, MORGANN DANIELS, AMERICA ROSE MARVELOUS HERVE, RYAN MICKELSEN, KAYL WARD, STEPHANIE OSPINA, ZOË FROMER, NICOLE IRRIZARRY and JULIETA WINTERS, Individually and on behalf of all other persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TOZZER LTD. D/B/A NIAGARA NYC AND LOVERS OF TODAY, LAPIZZA SHOP, INC., D/B/A 96 TEARS, BERLIN AND CABIN DOWN BELOW, BOWERY TECH RESTAURANT LLC D/B/A BOWERY ELECTRIC, JONATHAN TOUBIN, JOSHUA YERINGTON A/K/A "JOHNNY T", JESSE MALIN, AND LAURA MCCARTHY, Jointly and Severally,<br><br>Defendants. | ECF CASE<br><br>No.: 1:23-cv-9329 (AS)<br><br>FIRST AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

NATURE OF THE ACTION

1.     Plaintiffs Natasha Van Duser, Jackson Lea, Charlotte Mason, Tristan Hsu, Morgann Daniels, America Rose Marvelous Herve, Ryan Mickelsen, Kayl Ward, Stephanie Ospina, Zoë Fromer, Nicole Irrizarry and Julieta Winters worked as bartenders, servers, barbacks and as a coat check attendant for Defendants Tozzer Ltd. d/b/a "Niagara NYC" and "Lovers of Today," Lapizza Shop, Inc. d/b/a "96 Tears," "Berlin," and "Cabin Down Below," Bowery Tech Restaurant LLC d/b/a "Bowery Electric," Jonathan Toubin, Johnny Yerington a/k/a "Johnny T," Jesse Malin, and Laura McCarthy (collectively, "Defendants").

2.      Plaintiffs allege, on their behalf and other similarly situated current and former employees of Defendants, pursuant to Fed. R. Civ. P. 23 (a) and (b), that Defendants willfully violated the New York Labor Law by (i) failing to pay the minimum wage, (ii) failing to pay spread-of-hours pay, (iii) failing to provide the Notice and Acknowledgement of Payrate and Payday under N.Y. Lab. Law § 195.1, (iv) failing to provide an accurate wage statement under N.Y. Lab. Law § 195.3 with every wage payment, (v) failing to timely pay wages, and (vi) unlawfully retained gratuities.

3.      Plaintiffs allege, on their behalf and other similarly situated current and former employees of Defendants and those who elect to opt into this action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), that Defendants (i) failed to pay the minimum wage and (ii) willfully violated the FLSA by unlawfully retaining gratuities.

<u>JURISDICTION AND VENUE</u>

4.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1337, 1343, and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367. In addition, the Court has jurisdiction over Plaintiffs' FLSA claims under 29 U.S.C. § 216(b).

5.      Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1) and (2).

6.      This Court is empowered to issue a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

7.      On April 21, 2024, Defendants filed a motion to dismiss (Doc. No. 28), making this First Amended Complaint timely under Fed. R. Civ. P. 15(a)(1)(B).

<u>THE PARTIES</u>

8.      Plaintiff Van Duser was, at all relevant times, an adult individual residing

in New York, New York.

9.    Plaintiff Lea was, at all relevant times, an adult individual residing in New York, New York.

10.    Plaintiff Mason was, at all relevant times, an adult individual residing in New York, New York.

11.    Plaintiff Daniels was, at all relevant times, an adult individual residing in Ridgewood, New York.

12.    Plaintiff Herve was, at all relevant times, an adult individual residing in Brooklyn, New York.

13.    Plaintiff Ward was, at all relevant times, an adult individual residing in New York, New York.

14.    Plaintiff Ospina was, at all relevant times, an adult individual residing in Ridgewood, New York.

15.    Plaintiff Hsu was, at all relevant times, an adult individual residing in Brooklyn, New York.

16.    Plaintiff Fromer was, at all relevant times, an adult individual residing in Brooklyn, New York.

17.    Plaintifff Irrizarry was, at all relevant times, an adult individual residing in Brooklyn, New York.

18.    Plaintiff Ward was, at all relevant times, an adult individual residing in New York, New York.

19.    Plaintiff Winters was, at all relevant times, an adult individual residing in New York, New York.

20.     Upon information and belief, Defendant Tozzer, Ltd. is a domestic business corporation that is organized under New York law and is authorized to do business in the State of New York.

21.     Upon information and belief, Defendant Lapizza Shop, Inc. is a domestic business corporation that is organized under New York law and is authorized to do business in the State of New York

22.     Defendant Tozzer, Ltd. is, upon information and belief, an enterprise engaged in commerce or in the production of goods for commerce. Defendant Tozzer, Ltd. is engaged in commerce or in the production of goods for commerce, because, *inter alia*, it has employees that handle goods and materials that have been produced for and moved in commerce, and, upon information and belief, its annual gross volume of business is at least $500,000. These goods and materials that have been produced for and moved in commerce, which its employees have handled, including liquor, food, glassware, computers and beverages.

23.     Defendant LaPizza Shop, Inc. is, upon information and belief, an enterprise engaged in commerce or in the production of goods for commerce. Defendant LaPizza Shop, Inc. is engaged in commerce or in the production of goods for commerce, because, *inter alia*, it has employees that handle goods and materials that have been produced for and moved in commerce, and, upon information and belief, its annual gross volume of business is at least $500,000. These goods and materials that have been produced for and moved in commerce, which its employees have handled, including liquor, food, glassware, computers and beverages.

24.     Defendant Bowery Tech Restaurant LLC is, upon information and belief,

an enterprise engaged in commerce or in the production of goods for commerce. Defendant Bowery Tech Restaurant LLC is engaged in commerce or in the production of goods for commerce, because, *inter alia*, it has employees that handle goods and materials that have been produced for and moved in commerce, and, upon information and belief, its annual gross volume of business is at least $500,000. These goods and materials that have been produced for and moved in commerce, which its employees have handled, including liquor, food, glassware, computers and beverages.

25. Defendant Jonathan Toubin, upon information and belief, owns, operates and controls Defendants Tozzer, Ltd.'s, LaPizza Shop's and Bowery Tech Restaurant's day-to-day operations and management and jointly employed Plaintiffs and other similarly situated employees at all relevant times. He had the authority to hire and fire employees, set their work schedule and pay.

26. Defendant Laura McCarthy, upon information and belief, owns, operates and controls Defendants Tozzer, Ltd.'s, LaPizza Shop's and Bowery Tech Restaurant's day-to-day operations and management and jointly employed Plaintiffs and other similarly situated employees at all relevant times. She had the authority to hire and fire employees, set their work schedule and pay.

27. Defendant Johnny T Yerington, upon information and belief, owns, operates and controls Defendants Tozzer, Ltd.'s, LaPizza Shop's and Bowery Tech Restaurant's day-to-day operations and management and jointly employed Plaintiffs and other similarly situated employees at all relevant times. He had the authority to hire and fire employees, set their work schedule and pay.

28. Defendant Jesse Malin, upon information and belief, owns, operates and

controls Defendants Tozzer, Ltd.'s, LaPizza Shop's and Bowery Tech Restaurant's day-to-day operations and management and jointly employed Plaintiffs and other similarly situated employees at all relevant times. He had the authority to hire and fire employees, set their work schedule and pay.

29.     Each Defendant, either directly or indirectly, has hired Plaintiffs and other employees, fired other employees, controlled Plaintiffs' work schedules and employment conditions, determined their payment rate and method, and kept at least some records regarding their employment.

30.     At any given time, Defendants have and have had more than 11 employees.

31.     Defendants operated a single, integrated business enterprise that jointly employed Plaintiffs and the Class and Collective Action Members (as defined below).

<u>STATEMENT OF FACTS</u>

<u>Overview</u>

32.     Defendants Jonathan Toubin, Laura McCarthy, Johnny T Yerington and Jesse Malin jointly own, operate and manage multiple Manhattan bars that are located around the intersection of Avenue A and East 7th Street: Niagara Bar, 96 Tears, Lovers of Today, Berlin (Berlin is the only Avenue A Bar that is located at Avenue A and 2nd Street), and Cabin Down Below (collectively "Avenue A Bars"). They also own and operate Bowery Electric, which is located at 327 Bowery, New York, New York.

33.     Common ownership exists for the Avenue A Bars and Bowery Electric.

34.     Niagara Bar is open the following hours: Monday to Friday, 3:00 p.m. to 4:00 a.m.; and Saturday to Sunday, 2:00 p.m. to 4:00 a.m.

35.    Lovers of Today is open the following hours: Monday to Sunday, 5:00 p.m. to 4:00 a.m.

36.    96 Tears is open the following hours: Monday to Sunday, 5:00 p.m. to 2:00 a.m., or later if busy.

37.    Cabin Down Below is open the following hours: Thursday to Saturday, 10:00 pm. to 2:00 a.m., with the bar sometimes staying open later if busy.

38.    Berlin is open Monday to Sunday, 8:00 p.m. to 4:00 a.m.

39.    Bowery Electric is open the following hours: Monday to Sunday, 5:30 p.m. to 2:00 a.m.

40.    Bartenders, servers and barbacks working at Niagara Bar and Lovers of Today regularly arrive 1 hour before it opens to prepare for service and stay at least 30 minutes after it closes to close down the bar.

41.    Bartenders, servers and barbacks working at 96 Tears and Cabin Down Below regularly arrive 30 minutes before it opens to prepare for service and stay 30 minutes after to close down the bar.

42.    Except for Niagara Bar, Defendants regularly change the name of their bars: 96 Tears used to be Tompkins Square Bar and Black Market Burger; Cabin Down Below used to be Cabin and Sister Midnight; and Lovers of Today had another name.

43.    Jonathan Toubin, Laura McCarthy, Johnny T Yerington and Jesse Malin own many other bars throughout New York City, including Berlin, 2A, and Dream Baby.

44.    Defendants employ, at any one time, approximately 26 bartenders, servers and barbacks that they rotate around the Avenue A Bars on an as needed basis.

45.    Defendants post one weekly work schedule that shows at which bar their

Bartenders, servers and barbacks will be working at the Avenue A Bars.

46.    Defendants centralize control of the Avenue A Bars and Bowery Electric.

47.    Defendants have a centralized system to share supplies for the Avenue A Bars: there are two pantry rooms and three refrigerators that services all of the Avenue A Bars; and these are located adjacent to Lovers of Today.

48.    Defendants often ask their bar backs to bring ice, liquor, beer and other supplies from the Avenue A Bars to Bowery Electric.

49.    When Avenue A Bars run out of ice, a bar back will buy ice for the bars at a nearby grocery store and resupply the Avenue A Bars.

50.    Defendants rotate and share employees, equipment and supplies among the Avenue A Bars and Bowery Electric. For example, if one location is low on vodka, Defendants will move vodka from one bar to the other.

51.    An interrelation of operations exists among the Avenue A Bars and Bowery Electric.

52.    Defendants employed Barbara "Zoe" Lezcano as a manager who managed all of these locations.

53.    Common management exists for the Avenue A Bars and Bowery Electric.

54.    When Defendants Jonathan Toubin, Laura McCarthy, Johnny T Yerington and Jesse Malin come to their bars, they often tell their employees what to do and how to do it. They will also sometimes call one of the employees working at the bars and yell at them what to do and how to do it.

55.    Defendants do not permit bartenders, servers, barbacks or coat check attendants to take any breaks during their shift, including meal breaks.

<u>Defendants' Compensation Policies</u>

56.     Defendants pay their bartenders, servers, barbacks and coat check attendants $10.00 per hour.

57.     In paying their bartenders, servers, barbacks and coat check attendants at $10.00, Defendants were and still are claiming a tip credit against the statutory minimum wage.

58.     Defendants did not communicate, verbally or in writing, to their bartenders, servers, barbacks and coat check attendants that they are claiming a $5.00 tip credit against the minimum wage.

59.     Bartenders, servers, barbacks and coat check attendants' pay stubs do not state that Defendants are claiming a $5.00 tip credit allowance against the minimum wage.

60.     When one of Defendants' bartenders, servers, barbacks and coat check attendants work at more than one of their bars in a pay period, they will receive a check from each bar that they worked at during that pay period.

61.     Defendants require their bartenders, servers and barbacks to pool their tips.

62.     Defendants' managers are part of the tip pool and these managers have the authority to hire and fire employees, set employees' work schedules, and assign them work. One of those managers is Kelley Swindall.

63.     Defendants do not remit all credit card tips to their bartenders, servers, barbacks and coat check attendants. Defendants keep a portion of the credit card tips.

64.     Defendants automatically add a tip to orders with more than six drinks,

without disclosing this tip to the customer.

65.     Defendants do not track how much in tips their employees receive.

66.     Defendants do not know whether their employees' tips plus hourly rate equals them being paid at least the statutory minimum wage.

<u>Compensation and Scheduling</u>

67.     Up until about November 2022, Defendants paid their bartenders, servers, barbacks and coat check attendants every two weeks.

68.     By delaying payment to their bartenders, servers, barbacks and coat check attendants, they were underpaid for the work they performed; they were deprived of money that they are owed and need; the value of the money, when eventually paid, is less than it would have been if they were timely paid; and they were not able to purchase everything they would have purchased if timely paid.

69.     Defendants do not pay their bartenders, servers, barbacks and coat check attendants for every hour worked.

70.     When Defendants' bartenders, servers, barbacks and coat check attendants arrive before their scheduled shift to begin setting up the bar, Defendants do not pay them for that time. This includes time organizing the bar, cleaning up the bar, cutting up garnishes, setting up the seating, stocking the bar and organizing the coat check room.

71.     When Defendants' bartenders, servers, barbacks and coat check attendants stay after their scheduled shift to close down the bar, Defendants do not pay them for that time. This includes time organizing the bar, cleaning up the bar, cutting up garnishes, breaking down the seating, stocking the bar and organizing the coat check room.

72.     Defendants are aware that their bartenders, servers, barbacks and coat

check attendants are working before and after their scheduled shift because i) they clock in when they arrive and start working and clock out when they stop working, versus clocking in and out based on their scheduled shift, ii) they could not have performed their jobs without completing these pre-and post-shift activities, iii) they have complained about not being paid for all hours worked, and iv) a manager regularly sees them working before and after their scheduled shifts.

73.    As a result of this practice, Defendants are regularly not paying their bartenders, servers, barbacks and coat check attendants for 30 minutes to 2 hours per week of compensable time.

74.    Defendants would alter the bartenders, servers, barbacks and coat check attendants' time records to subtract their pre- and post- shift activities.

75.    Defendants' bartenders, servers, barbacks and coat check attendants' paystubs do not correctly reflect all of the hours that they worked as a consequence of Defendants altering their time records.

76.    When Defendants' bartenders, servers, barbacks and coat check attendants work 10 hours or more in a day, Defendants do not pay them an extra hour at the minimum wage.

77.    Defendants did not and do not provide Plaintiffs or the other bartenders, servers, barbacks and coat check attendants with an accurate wage statement under N.Y. Lab. Law § 195.3 with every wage payment.

78.    When hiring them and at no point during their employment have Defendants provided their bartenders, servers, barbacks and coat check attendants the required Notice and Acknowledgment of Payrate and Payday under N.Y. Lab. Law §

195.1.

79.    Defendants' failure to provide their bartenders, servers, barbacks and coat check attendants with the N.Y. Lab. Law § 195.1 notice and accurate wage statements deprived them of the information necessary for review their wages and hours worked and was a direct cause for their economic injury and, in fact, resulted in their wages being underpaid.

80.    If Defendants had complied with the N.Y. Lab. Law §§ 195.1 and 195.3 notices and wage statements, their bartenders, servers, barbacks and coat check attendants would have been able to see that they were not being lawfully paid and would have been able to avoid underpayment of their wages.

81.    Defendants did not post at any of their bars an up-to-date poster advising Plaintiffs and other employees of their right to a minimum wage and overtime premium pay.

Training

82.    In the week before they are officially put on the schedule and paid for their hours worked, Defendants require new bartenders, servers and barbacks to attend at least one training session, during which they shadow a current employee. This training session lasts a complete shift. Defendants do not pay for this training, resulting in Defendants not paying the employees anything during the week the training occurs.

83.    Approximately three times a year, Defendants require their employees to attend staff meetings at Niagara Bar which last between 1 to 3 hours, but Defendants do not compensate their employees for these staff meetings.

84.    Defendants require Plaintiffs to hold a food handler's license and to receive TIPS Alcohol Safety training. This training is directly related to Plaintiffs' duties. Defendants do not pay Plaintiffs for this training.

85.    TIPS is not a government-mandated training program. It is a voluntary program provided by the New York State Liquor Authority.

86.    Defendants require Plaintiffs to attend sexual harassment training but do not pay for it. The training lasts about 1 hour.

87.    Having owned and operated numerous bars for many years, Defendants are familiar with and know what the Labor Law and FLSA require and prohibit, including having to compensate employees for all hours worked, having to compensate employees for mandatory training, and excluding managers from the tip pool.

88.    Defendants structured their compensation policies with the goal of reducing labor costs, versus complying with the FLSA and Labor Law.

89.    Defendants purposely misreported the hours worked on Plaintiffs' wage statements to, in part, try to conceal they were not paying the Plaintiffs for all hours worked and to try to make litigation against them more difficult.

90.    When they work at multiple locations in one pay period, Defendants purposely give Plaintiffs multiple paychecks to make it difficult for them to determine whether they are being lawfully paid.

Defendants' Bartenders' and Barbacks' Duties

91.    Defendants' bartenders are responsible for setting up for their shift, serving customers, cutting up garnishes, setting up the outdoor seating, organizing the bar by moving bottles around to their appropriate location, cleaning their bar during their

shift and closing up their bar after their shift.

92.     Defendants' servers were responsible for setting up for their shift, taking customer orders, serving customers, opening up their sections, closing down their sections and helping where necessary.

93.     Defendants' barbacks duties include opening the bar, closing down the bar, stocking the bar with, cleaning up the bar and many other physical activities.

94.     Defendants' coat check attendants include taking customers' coats, giving them their coats, organizing the coat check room, and any other physical duties that are required during that shift.

95.     Defendants' bartenders, servers, barbacks and coat check attendants are spending close to their entire shift performing physical labor.

96.     Defendants prohibit their bartenders, servers, barbacks and coat check attendants from sitting during their shifts.

Plaintiff Natasha Van Duser

Employment Period and Duties

97.     Defendants employed Plaintiff Van Duser as a bartender from approximately March 17, 2021 to September 11, 2023.[1]

98.     Plaintiff Van Duser worked as a bartender for Defendants at Lovers of Today and Niagara.

99.     As a bartender, Plaintiff Van Duser's duties included making drinks, serving customers, organizing the bar, cleaning up the bar, opening up the bar prior to her shift, closing down the bar after her shift and cutting up garnishes.

---

[1] The date ranges are estimates based on Plaintiff's memory.

100.     Plaintiff Van Duser, in performing her duties, spent practically her entire shift doing physical labor.

Hours Worked

101.     Plaintiff Van Duser's regular work schedule was four days a week, equaling 27 hours: Tuesday from 4:00 p.m. to 10:00 p.m. (6 hours); Wednesday from 4:00 p.m. to 10:00 p.m. (6 hours); Friday from 9:00 p.m. to 4:30 a.m. (7.5 hours); and Saturday from 8:30 p.m. to 4:00 a.m. (7.5 hours).

102.     Prior to her first week on the schedule, Plaintiff Van Duser had to shadow another employee at work for about 4 hours. This occurred in a week around early March 2021.

103.     For most days that she worked, Plaintiff Van Duser arrived before her scheduled shift and kept working after her scheduled shift to open up and close down the bar, ranging between 30 minutes to 2 hours of such time.

104.     Plaintiff Van Duser, along with other employees, was required to attend, on average, 2 staff meetings every year, with each mandatory staff meeting lasting at least 1 hour.

Compensation

105.     Defendants paid Plaintiff Van Duser $10.00 per hour.

106.     Up until about November 2022, Defendants paid Plaintiff Van Duser every two weeks.

107.     Defendants did not pay Plaintiff Van Duser for her pre- and post-shift activities.

108.     Plaintiff Van Duser clocked in and out when she started and stopped

working.

109.    Plaintiff Van Duser would not be able to perform her bartending duties absent performing the pre- and post-shift work.

110.    Defendants altered Plaintiff Van Duser's time records to subtract her pre- and post-shift activities. For example, on August 19, 2023 Plaintiff Van Duser clocked in at 8:18 p.m. but Defendants changed that to 8:30 p.m., and on August 15, 2023, she clocked in at 3:43 p.m. but Defendants changed that to 4:00 p.m.

111.    Plaintiff Van Duser's co-workers have complained to her about not being paid all of their hours worked as a consequence of Defendants not paying them for their pre- and post-shift activities.

112.    Defendants did not pay Plaintiff Van Duser for the mandatory staff meetings, nor for the training.

113.    Plaintiff Van Duser has complained multiple times about not being paid for all hours worked but Defendants never changed their policy.

114.    Plaintiff Van Duser does not recall Defendants ever providing the required Notice and Acknowledgement of Payrate and Payday under N.Y. Lab. Law § 195.1.

115.    Defendants did not provide Plaintiff Van Duser with an accurate wage statement under N.Y. Lab. Law § 195.3 with every wage payment.

116.    Plaintiff Van Duser has worked more than 10 hours in a day when working a double shift.

117.    When she worked more than 10 hours in a day, Defendants did not pay Plaintiff Van Duser an extra hour at the minimum wage.

118.    From speaking with them, Plaintiff Van Duser knows that other bartenders

were, like her, not paid all of their hours worked, were paid below the statutory minimum wage, were not given the required Labor Law notices, and had to contribute their tips to a tip pool with managers.

Plaintiff Jackson Lea

Duties and Work Schedule

119.   Defendants have employed Plaintiff Lea since May 5, 2021: from May 2021 to August 2021 as a barback; from October 2021 to December 2021 as a server; and as a bartender from May 5, 2021 to the present.

120.   Plaintiff Lea worked as a bartender for Defendants at Niagara Bar, Cabin Down Below and 96 Tears (then known as Tompkins Square Bar).

121.   As a bartender, Plaintiff Lea's duties include serving customers drinks and food, organizing the bar, making the drinks, batching drinks (frozen and premade shots), setting up the bar, breaking down the bar, cleaning up the bar, and organizing the bar.

122.   As a barback, Plaintiff Lea's duties included cleaning the bathrooms, cleaning the dance floor,

123.   In performing his bartender duties, Plaintiff Lea spent at least 75% of his shift doing physical labor.

124.   Plaintiff Lea's current regular work schedule is three days a week: 9:00 p.m. to 2:00 a.m./3:00 a.m., Thursday to Saturday.

125.   Plaintiff Lea's work schedule as a barback was 6:00 p.m. to 6:00 a.m. and 2:00 p.m. to 4:00 a.m.

126.   Plaintiff Lea's work schedule as a server was from 4:00 p.m. to 12:00 am.

127.   Plaintiff Lea would sometimes work 2-3 hour swing shifts in 2023 and

2023.

128.    On one night, Defendants required Plaintiff Lea to work the door at Cabin Down Below when it was -5 degrees and they required him to sit outside for 6 hours.

129.    In addition to his regular work schedule, Plaintiff Lea would be asked to fill in for other bartenders.

130.    For most days that he worked, Plaintiff Lea arrived before his scheduled shift and kept working after her scheduled shift to open up and close down the bar, ranging between 30 minutes to 2 hours of such time.

131.    For the week before Defendants put Plaintiff Lea on the schedule and paid Plaintiff Plea for hours worked, Plaintiff Lea attended 3 required training sessions in May 2021, with each lasting 4-5 hours.

132.    Defendants did not pay Plaintiff Lea for the training sessions.

133.    Plaintiff Lea attended approximately 4 mandatory staffing meetings, with each lasting around 1 hour.

134.    Defendants did not pay Plaintiff Lea for the staff meetings.

135.    When working double shifts, working from 6:00 p.m. to 6:00 a.m., Plaintiff Lea would work more than 10 hours in a day.

136.    Defendants directed Plaintiff Lea to purchase ice at a nearby grocery store to resupply all of the Avenue A Bars.

137.    Levi Zolman (Manager) told Plaintiff Lea to bring beer, liquor and other supplies from the Avenue A Bars to Bowery Electric.

138.    Jonathan Toubin, Johnny T Yerington and Jesse Malin often came to Niagara, would see Plaintiff Lea and tell him what to do. Johnny T Yerington would, for

example, yell at Plaintiff Lea and others to stay busy and to never stand still.

139.    Jonathan Toubin (mainly for 96 Tears), Johnny T Yerington and Jesse Malin would attend the staff meetings that Plaintiff Lea attended and would talk about how to operate the bars.

Compensation

140.    Defendants paid Plaintiff Lea $10.00 per hour.

141.    Up until about November 2022, Defendants paid Plaintiff Lea every two weeks.

142.    Defendants did not pay Plaintiff Lea for his pre- and post-shift activities.

143.    Plaintiff Lea clocked in and out when he started and stopped working.

144.    Plaintiff Lea would not be able to perform his bartending duties absent performing the pre- and post-shift work, including emailing Zoe Lezcano (Manager) about this but nothing was done.

145.    Defendants have altered Plaintiff Lea's work hours to subtract the hours he worked pre and post shift. For example, on August 31, 2023, Plaintiff Lea clocked out at 5:29 a.m. but Defendants changed that to 4:00 a.m.; on September 3, 2023, Plaintiff Lea clocked out at 5:32 a.m. but Defendants changed that to 4:00 a.m.

146.    Plaintiff Lea's co-workers have complained to him about not being paid for all of their hours worked as a consequence of Defendants not paying them for their pre- and post-shift activities.

147.    Defendants, at no point, told Plaintiff Lea that they were claiming a $5.00 tip credit allowance against the minimum wage.

148.    Plaintiff Lea's paystubs do not state Defendants are claiming a tip credit

allowance against the minimum wage.

149.    Plaintiff Lea has complained multiple times about not being paid for all hours worked but Defendants never changed their policy.

150.    Plaintiff Lea does not recall Defendants ever providing the required Notice and Acknowledgement of Payrate and Payday under N.Y. Lab. Law § 195.1.

151.    Defendants did not provide Plaintiff Lea with an accurate wage statement under N.Y. Lab. Law § 195.3 with every wage payment, as they did not reflect the hours he actually worked since Defendants altered the time records.

152.    Defendants did not pay Plaintiff Lea spread-of-hours pay.

153.    Plaintiff Lea's paystubs do not state Defendants are claiming a tip credit against the minimum wage.

154.    Defendants required Plaintiff Lea to train other employees but did not compensate Plaintiff Lea for that time.

Plaintiff Morgann Daniels

Work Schedule and Duties

155.    Plaintiff Daniels has worked for Defendants since 2015 as a bartender and has occasionally been asked to step in as a barback.

156.    Plaintiff Daniels worked as a bartender for Defendants at Niagara, Berlin, Bowery Electric, Cabin Down Below, Coney Island Baby, Tomkins Square Bar and Black and White.

157.    Plaintiff Daniels worked at Bowery Electric in 2017 and 2018.

158.    Up until 2021, Plaintiff Daniels worked Wednesday, Friday and Saturday nights and all Sunday.

159.    Plaintiff Daniels' regular work schedule is Thursday and Friday, 2:00 p.m. to 9:00 p.m., totaling 14 hours.

160.    While she was working at their various bars, Defendants Laura McCarthy and Jesse Malin would come there and tell her what to do and how to do it. Defendant McCarthy would, most often, call the bar and tell the employees what to do.

161.    As a barback, Plaintiff Daniels' duties included taking away dirty glasses from the bar, bringing cleaning glasses to the bar, bringing ice to the bar, cleaning up the bar and bringing all other necessary supplies to the bar.

162.    As a bartender, Plaintiff Daniels' duties include serving customers drinks, organizing the bar, setting up the bar, breaking down the bar, cleaning up the bar, and organizing the bar.

163.    In performing her bartender duties, Plaintiff Daniels spent at least 75% of her shift doing physical labor.

164.    Plaintiff Daniels attended the required training when she was initially hired and, like others, was not paid for it.

165.    Every two years, Defendants require Plaintiff Daniels to complete TIPS certification training, which involves between 6-8 hours in a week.

166.    Every year, Defendants require that Plaintiff Daniels complete sexual harassment training, which lasts on average 1 hour.

167.    Plaintiff Daniels completes the TIPS certification and sexual harassment training in the same week.

168.    In February 2024, Plaintiff Daniels most recently completed the sexual harassment and TIPS certification training.

<u>Compensation</u>

169.    Defendants always paid Plaintiff Daniels, regardless of position or location, $10.00 per hour.

170.    Up until about November 2022, Defendants paid Plaintiff Daniels every two weeks.

171.    Defendants did not pay Plaintiff Daniels for her pre- and post-shift activities, which was at least 30 minutes every shift. This pre- and post-shift work involved opening up the bar, getting the bar organized, organizing and preparing garnishes, and closing down the bar.

172.    Plaintiff Daniels clocked in and out when she started and stopped working.

173.    Plaintiff Daniels would not be able to perform her bartending duties absent performing the pre- and post-shift work.

174.    Defendants did not pay Plaintiff Daniels for her TIPS certification and sexual harassment training.

175.    With Defendants not paying Plaintiff Daniels for the 6-hour TIPS certification and not paying her for her 30-minutes of pre- and post-shift work each shift and only paying her for the 14 hours at $10.00 per hour, her effective hourly rate for those weeks, including the week in February 2024, was $6.67: 14 scheduled hours + 6 hour TIPS training + 1 hour of pre-and post-shift work = 21 hours; $140/21 hours = $6.67.

176.    Defendants did not permit Plaintiff Daniels to take meal breaks and often required Plaintiff Daniels to work more than 10 hours with no breaks.

177.    Plaintiff Daniels does not recall Defendants ever providing her with the

required Notice and Acknowledgement of Payrate and Payday under N.Y. Lab. Law § 195.1.

178.    Defendants did not provide Plaintiff Daniels with an accurate wage statement under N.Y. Lab. Law § 195.3 with every wage payment, as they did not reflect the hours she actually worked since Defendants altered the time records.

179.    Plaintiff Daniels' paystubs do not state Defendants are claiming a tip credit against the minimum wage.

180.    When Plaintiff Daniels worked more than 10 hours in a day, when working double shifts, Defendants did not pay her an extra hour at the minimum wage.

181.    From speaking with them, Plaintiff Daniels knows that other bartenders were, like her, not paid for all of their hours worked, were paid below the statutory minimum wage, were not paid overtime, were not given the required Labor Law notices, and had to contribute their tips to a tip pool with managers.

Plaintiff Charlotte Mason

  Work Schedule and Duties

182.    Since August 2, 2020, Defendants have employed Plaintiff Mason as a server and bartender at Niagara, Cabin Down Below, Berlin and 96 Tears (Thompkins Square Bar at that time), with Plaintiff Mason working as a server until September 2021 when she became a bartender.

183.    Plaintiff Mason's duties as a bartender include serving customers drinks, organizing the bar, setting up the bar, breaking down the bar, cleaning up the bar, and organizing the bar.

184.    In performing these duties, Plaintiff Mason is doing physical labor

practically her entire shift.

185.   When she was hired, Defendants required Plaintiff Mason to attend a mandatory 4-hour training session. Then, in September 2021, Plaintiff Mason had to attend another 4-hour training session to bartend.

186.   Plaintiff Mason attended approximately two mandatory staff meetings each year, with each lasting between 1 to 3 hours.

187.   Plaintiff Mason's work schedule has fluctuated between 4 and 5 days per week.

188.   Up until December 2022, Plaintiff Mason worked 26 hours a week.

189.   Her work schedule for the past 1.5 years is as follows: Monday from 2:00 p.m. to 9:00 p.m.; Tuesday from 2:00 p.m. to 9:00 p.m.; Friday from 8:30 p.m. to 3:00 or 3:30 a.m.; Saturday from 1:00 p.m. to 9:00 p.m.

190.   Plaintiff Mason often started working before and after her shifts were scheduled to end, equaling about 30 minutes each day.

191.   During a week in March 2022, Plaintiff Mason completed the mandatory training to obtain her food handler license, which took 2 days to complete, totaling 8 hours. And in February 2024 Plaintiff Mason completed the TIPS training and sexual harassment training.

192.   Plaintiff Mason would not have been able to complete her bartender duties had she not started working before her shift was scheduled to start and working beyond when her shift was scheduled to end.

193.   Plaintiff Mason's manager saw Plaintiff Mason working before her shift was scheduled to start and working after her shift was scheduled to end.

194.    When working double shifts, Plaintiff Mason worked more than 10 hours in a day. This happened multiple times each year.

195.    Plaintiff Mason has trained multiple employees on working as a bartender for Defendants.

<u>Compensation</u>

196.    Plaintiff Mason never saw a poster at Niagara advising her of her rights to a minimum wage or overtime.

197.    Defendants did not pay Plaintiff Mason for the mandated training sessions, nor did they pay Plaintiff Mason for the TIPS training or sexual harassment training.

198.    Defendants did not pay Plaintiff Mason for the staff meetings.

199.    Defendants did not pay Plaintiff Mason when she trained other employees.

200.    Defendants did not pay Plaintiff Mason spread-of-hours pay.

201.    Defendants did not pay Plaintiff Mason for her work before and after her shifts were scheduled to end, equaling about 30 minutes of unpaid work each day.

202.    Defendants paid and continue to pay her $10.00 per hour.

203.    For the September 2021 week when Plaintiff Mason had to attend the 4-hour training session to bartend, Plaintiff Mason was not otherwise on the work calendar and was not paid for any hours that week.

204.    At no time did Defendants advise Plaintiff Mason that they were claiming a tip credit against the minimum wage.

205.    Plaintiff Mason does not recall Defendants ever providing her with the Notice of Acknowledgement of Payrate and Payday.

206.    Defendants did not provide Plaintiff Mason with an accurate wage statement under N.Y. Lab. Law § 195.3 with every wage payment.

207.    Up until around the end of 2022, Defendants paid Plaintiff Mason every two weeks.

Plaintiff Tristan Hsu

Duties and Schedule

208.    Defendants employed Plaintiff Hsu from October 2022 to September 11, 2023 as a bar back, server, doorperson, coat check attendant and bartender.

209.    Plaintiff Hsu worked for Defendants at Niagara, 96 Tears and Cabin Down Below.

210.    Plaintiff Hsu's initial work schedule was two days a week.

211.    Plaintiff Hsu later worked four days a week, Wednesday to Saturday: Wednesday, from 4:30 p.m. to 1:30 a.m. or later; Thursday, from 6:30 p.m. to 12:30 a.m.; Friday, from 4:30 p.m. to 12:30 a.m.; and Saturday from 2:00 p.m. to 12:30 a.m.

212.    Defendants Jonathan Toubin and Jesse Malin would come to Niagara and 96 Tears when Plaintiff Hsu was there and would tell him what to do around the bar.

213.    As a bartender, Plaintiff Hsu's duties include serving customers drinks, organizing the bar, setting up the bar, breaking down the bar, cleaning up the bar, and organizing the bar.

214.    As a barback, Plaintiff Hsu's duties included taking away dirty glasses from the bar, bringing cleaning glasses to the bar, bringing ice to the bar, cleaning up the bar and bringing all other necessary supplies to the bar.

215.    As a coat check person, Plaintiff Hsu's duties included taking customers'

coats, giving them a coat check number, hanging up the coat and then giving customers back their coats.

216.    Working the front door, Plaintiff Hsu's duties included checking IDs, managing the crowds and providing other manual labor as needed around the bar.

217.    In performing his bartender, font door, coat check and barback duties, Plaintiff Hsu spent at least 75% of her shift doing physical labor.

218.    The week before being officially on the schedule and before Defendants paid him for any time worked, Plaintiff Hsu was required to shadow a bartender for 2 shifts, with each shift lasting 4-5 hours. Defendants did not pay him for this training. This occurred in a week, in or about, early October 2022.

219.    Plaintiff Hsu has attended at least 1 staff meeting, which lasted 2-3 hours, and was not paid for it.

220.    Plaintiff Hsu did not see a poster advising him of his right to be paid the minimum wage or overtime.

221.    Plaintiff Hsu is aware of multiple times when various supplies, including kitchen equipment, was brought from the Avenue Bars to Bowery Electric.

<u>Compensation</u>

222.    Defendants paid Plaintiff Hsu $10.00 per hour.

223.    Up until the end of 2022, Defendants paid Plaintiff Hsu every two weeks.

224.    At no point did Defendants explain to Plaintiff Hsu that they were claiming a tip credit against the minimum wage.

225.    Plaintiff Hsu does not recall Defendants ever providing him with the Notice and Acknowledgement of Payrate and Payday under N.Y. Lab. Law § 195.1.

226.    Defendants did not provide Plaintiff Hsu with an accurate wage statement under N.Y. Lab. Law § 195.3 with every wage payment.

227.    Plaintiff Hsu pooled his tips.

228.    Defendants paid Plaintiff Hsu every two weeks up until the end of 2022.

229.    Plaintiff Hsu would work 10 hours or more in a day when working double shifts but was not paid an extra hour at the minimum wage for those days.

230.    Defendants did not pay Plaintiff Hsu for all of the hours he worked pre- or post-shift.

231.    On approximately 20 occasions, if not more, Defendants did not pay Plaintiff Hsu for his pre-shift activities despite clocking in when he started to work and despite Plaintiff Hsu not being able to complete his duties without this pre-shift work.

232.    When working the front door, his manager took all of the tips Plaintiff Hsu collected and said they went "to the house" but those tips were not distributed to the bartenders, servers or barbacks.

Plaintiff America Rose Marvelous Herve

Duties and Work Schedule

233.    Defendants have employed Plaintiff Herve since March 2023.

234.    Defendants initially employed Plaintiff Herve as a server but then promoted her to a bartender.

235.    In the week prior to Plaintiff Herve being on the schedule and being paid by Defendants, she, like all of Defendants' employees, was required to shadow another employee for an entire shift, which lasted at least 8 hours. This was during a week in late February or early March 2023.

236.    Plaintiff Herve has worked for Defendants as a server and bartender at Niagara, 96 Tears, Cabin Down Below, Lovers of Today and Bowery Electric.

237.    As a bartender, Plaintiff Herve's duties include taking customers' orders, serving customers drinks, preparing their drinks, organizing the bar, setting up the bar, breaking down the bar, cleaning up the bar, and organizing the bar.

238.    As a server, Plaintiff Herve's duties including taking customers' orders, serving them their drinks, cleaning up the tables and helping to clean up the bar.

239.    In performing her duties as a server and bartender, Plaintiff Herve spends well over 80% of her time doing physical labor.

240.    Plaintiff Herve normally works two days a week.

241.    If Plaintiff Herve is working as a bartender, she typically works from 4:30 p.m. to 4:00 a.m. She will occasionally leave earlier if the bar is slow.

242.    If Plaintiff Herve is working as a server, she typically works from 2:00 p.m. to 1:30 a.m. on the weekends and from 6:30 p.m. to 12:30 a.m./1:30 a.m. on the weekends. She will occasionally leave earlier if the bar is slow.

243.    To complete her bartender or server duties, Plaintiff Herve often had to work past when her shift was scheduled to end.

244.    Plaintiff Herve does not recall seeing a poster advising her of her rights to a minimum wage or overtime.

245.    Defendants, at no point, gave Plaintiff Herve the Notice and Acknowledgement of Payrate and Payday.

246.    Plaintiff Herve's paystubs reflect the hours she was scheduled to work, not the hours she actually worked, making her paystubs inaccurate.

247.     Plaintiff Herve does not recall Plaintiff ever providing her with the required Notice and Acknowledgement of Payrate and Payday under N.Y. Lab. Law § 195.1.

Compensation

248.     Defendants paid Plaintiff Herve $10.00 per hour.

249.     Defendants never advised, verbally or written, that they were claiming a $5.00 per hour tip credit allowance against the minimum wage.

250.     Plaintiff Herve's paystubs do not state Defendants are claiming a tip credit against the minimum wage.

251.     Defendants did not compensate Plaintiff Herve for the required training.

Plaintiff Ryan Mickelsen

Duties and Work Schedule

252.     Defendants employed Plaintiff Mickelsen as a bartender from April 2022 to November 2022.

253.     While Defendants did employ Plaintiff Mickelsen as a manager for the last three weeks of his employment, he is not asserting any claims for those three weeks and all allegations in this Complaint concerning his employment period with Defendants focus on when he worked as a bartender.

254.     Plaintiff Mickelsen worked as a bartender at Niagara, Lovers of Today, Cabin Down Below, and 96 Tears (then known as Tompkins Square Bar).

255.     Plaintiff Mickelsen's duties as a bartender included taking customers' orders, making their drinks, organizing the bar, cleaning up the bar, setting up the bar, closing down the bar and preparing garnishes.

256.    Plaintiff Mickelsen, in performing his bartender duties, spent at least 80% of his shift doing manual labor.

257.    Plaintiff Mickelsen worked four days a week for Defendants: Friday, Saturday and two weekdays.

258.    Plaintiff Mickelsen would alternate between working a day shift (2:00 p.m. to 9:00 p.m.) and a night shift (9:00 p.m. to 4:00 a.m./5:00 a.m.).

259.    When Plaintiff Mickelsen would work a double shift, he would work more than 10 hours in a day.

260.    In the week before Plaintiff Mickelsen was on the schedule and Defendants were paying him, he, like all employees, was required to shadow a current employee for an entire which, which listed about 6 hours. This occurred during a week of late March or early April 2022.

261.    Plaintiff Mickelsen did not see a poster at any of Defendants' bars advising him of his right to a minimum wage or overtime.

262.    Defendants, at no point, provided Plaintiff Mickelsen with a Notice and Acknowledgement of Payrate and Payday.

263.    Plaintiff Mickelsen would see Defendants Jonathan Toubin and Jesse Malin at the bars, and they would give various directions on things they want done, including how loud the music should be.

264.    Plaintiff Mickelsen is aware of Defendants sending bartenders and an assistant manager from Niagara to go work at Bowery Electric.

265.    Plaintiff Mickelsen had to attend a mandatory staff meeting that lasted about 1 hour.

266.    Defendants never provided Plaintiff Mickelsen with the required Notice and Acknowledgement of Payrate and Payday under N.Y. Lab. Law § 195.1.

267.    Defendants did not provide Plaintiff Mickelsen with an accurate wage statement under N.Y. Lab. Law § 195.3 with every wage payment.

<u>Compensation</u>

268.    Defendants did not pay Plaintiff Mickelsen an extra hour at the minimum wage when he worked 10 hours in a day.

269.    Defendants paid Plaintiff Mickelsen $10.00 per hour.

270.    At no point did Defendants advise Plaintiff Mickelson, verbally or in writing, that they were claiming a $5.00 tip credit allowance for every hour he worked.

271.    Plaintiff Mickelsen's paystubs do not state Defendants are claiming a $5.00 tip credit allowance.

272.    Defendants paid him every two weeks.

273.    Defendants did not remit 100% of the credit card tips to Plaintiff Mickelsen.

274.    Defendants did not pay Plaintiff Mickelsen for any mandatory staff meeting he had to attend, nor the required training.

<u>Plaintiff Kayl Ward</u>

<u>Duties and Work Schedule</u>

275.    Defendants employed Plaintiff Ward from April 2023 to August 2023 as a server.

276.    Plaintiff Ward worked as a server for Defendants at Niagara and 96 Tears.

277.    As a server, Plaintiff Ward's duties included taking customers' orders,

bringing them their drinks, stocking the fridges, bussing tables, and providing general assistance to the bar.

278.   Plaintiff Ward, in performing her server duties, spent at least 80% of her shift doing manual labor.

279.   Plaintiff Ward worked 3-4 days a week.

280.   Her work schedule was as follows: when working weekdays, she worked from 6:30 p.m. to between 11:30 p.m. and 12:30 a.m.; for Friday, 4:30 p.m. to 1:00 a.m.; Saturday and Sunday from 2:00 p.m. to 2:00 a.m.

281.   In the week before being on the schedule and being paid for hours worked, Plaintiff Ward was required to shadow an employee, which lasted about 8 hours. Defendants did not pay for this time. This occurred in a week in late March 2023 or early April 2023.

282.   Plaintiff Ward did not see a poster anywhere advising her of her rights to a minimum wage or overtime.

283.   Plaintiff Ward would see Defendants Jonathan Toubin and Jesse Malin at the bars, and they would give various directions on things they want done. Defendants Jonathan Toubin, for example, would tell Plaintiff Ward to fix the lights, fix the fans and to change the music.

284.   Plaintiff Ward does not recall Defendants ever providing her with the required Notice and Acknowledgement of Payrate and Payday under N.Y. Lab. Law § 195.1.

285.   Defendants did not provide Plaintiff ward with an accurate wage statement under N.Y. Lab. Law § 195.3 with every wage payment.

-33-

Compensation

286.    Defendants paid Plaintiff Ward $10.00 per hour.

287.    Defendants did not pay Plaintiff Ward for all hours she worked.

288.    Defendants did not pay Plaintiff Ward for her pre- and post-shift activities.

289.    Plaintiff Ward's pre- and post-shift activities were necessary for her to complete her duties and were performed in front of management.

290.    Plaintiff Ward clocked in based on when she started and stopped working.

291.    Defendants never advised Plaintiff Ward, verbally or in writing, that they were claiming a $5.00 tip credit allowance against the minimum wage.

Plaintiff Stephanie Ospina

Duties and Work Schedule

292.    Defendants have employed Plaintiff Ospina as a bartender since October 2022.

293.    Plaintiff Ospina has worked for Defendants at Niagara, Cabin Down Below, 96 Tears and Lovers of Today.

294.    As a bartender, Plaintiff Ospina's duties include taking drink orders, making the drinks, cleaning the bar, restocking the bar, organizing the bar, setting up the bar and breaking down the bar.

295.    Plaintiff Ospina, in performing her bartender duties, spent at least 80% of her shift doing physical labor.

296.    Plaintiff Ospina works 4 days a week, usually between Wednesday and Sunday.

297.    Plaintiff Ospina's work shifts are 2:00 p.m. to 10:00 p.m., 4:00 p.m. to

10:00 p.m., or 10:00 p.m. to 4:00 a.m.

298.    In the week prior to being on the schedule and being paid, Plaintiff Ospina had to shadow a current employee of Defendants for a full shift, which was for at least two hours. This occurred in a week around October 2022.

299.    Plaintiff Ospina will more than 10 hours in a day when she works double shifts.

300.    Plaintiff Ospina has not seen a poster at any of the bars advising her of a right to a minimum wage or overtime.

301.    Plaintiff Ospina will see Defendant Jesse Malin at the bars, while she is working, and he will give her various directions on things he wants done.

302.    Defendants, at no point, have provided Plaintiff Ospina with a Notice of Acknowledgement of Payrate and Payday.

303.    Defendants, at no point, advised Plaintiff Ospina that they were claiming a tip credit of $5.00 per hour against the minimum wage.

304.    Plaintiff Ospina's pay stubs do not state Defendants are claiming a $5.00 tip credit allowance per hour worked.

305.    Defendants did not provide Plaintiff Ospina with an accurate wage statement under N.Y. Lab. Law § 195.3 with every wage payment.

Compensation

306.    Plaintiff Ospina has attended mandatory staff meetings with about 15 other employees, with each lasting 2-3 hours.

307.    Defendants do not pay Plaintiff Ospina for those meetings.

308.    Defendants did not pay Plaintiff Ospina for the required training.

309.   Defendants will not let Plaintiff Ospina and others clock in for the meetings.

310.   Defendants do not pay Plaintiff Ospina spread-of-hours pay.

311.   Defendants do not pay Plaintiff Ospina for all hours worked.

312.   Defendants do not pay Plaintiff Ospina for her hours worked pre- and post-shift.

313.   Plaintiff Ospina is not able to complete her duties without working these pre- and post-shift activities.

314.   Plaintiff Ospina has complained to her managers about not being paid for all hours worked.

Plaintiff Zoë Fromer

Duties and Work Schedule

315.   Defendants employed Plaintiff Fromer since October 2021 as a bartender as Tompkins Square Bar (now known as 96 Tears), Niagara and Lovers of Today.

316.   As a bartender, Plaintiff Fromer's duties include taking drink orders, making the drinks, cleaning the bar, restocking the bar, organizing the bar, setting up the bar and breaking down the bar.

317.   In performing these duties, Plaintiff Fromer's entire shift involves performing manual labor.

318.   Starting around April 2022, Plaintiff Fromer was working just at Lovers of Today as a bartender.

319.   Up until around mid-January 2022, Plaintiff Fromer worked the following schedule: Monday and Tuesday (at Lovers of Today) from 4:00 p.m. to 10:00 p.m.;

Friday and Saturday (at Tompkins Square Bar) from 11:00 p.m. to close, which was around 4:00 a.m.; and Sunday (at Lovers of Today) from 9:00 p.m. to close.

320.    From mid-January to February 2022, Plaintiff Fromer worked the following schedule: Tuesday (at Lovers of Today) from 4:00 p.m. to 10:00 p.m.; Friday and Saturday (at Tompkins Square Bar) from 11:00 p.m. to close, which was around 4:00 a.m.; and Sunday (at Lovers of Today) from 9:00 p.m. to close.

321.    From March 2022 to April 2022, Plaintiff Fromer worked the following schedule: Thursday from 10:00 p.m. to close; Friday (Tompkins Square Bar) from 6:00 p.m. to 2:00 a.m.; Saturday (at Niagara) from 10:00 to close; and Sunday (at Lovers of Today) from 10:00 p.m. to close.

322.    From June 2022 to June 2023, Plaintiff Fromer worked the following schedule, exclusively at Lovers of Today: Wednesday from 10:00 p.m. to close; Thursday from 10:00 p.m. to close; Friday from 9:00 p.m. to close; and Sunday from 4:00 p.m. to close.

323.    From June 2023 to January 2024, Plaintiff Fromer worked exclusively at Lovers of Today at the following schedule: Thursday from 9:00 p.m. to close; and Friday and Saturday from 8:00 p.m. to close. From January 25, 2024 to present, Plaintiff Fromer worked exclusively at Lovers of Today at the following schedule: Thursday from 4:00 p.m. to 11:00 p.m.; and Friday and Saturday from 8:00 p.m. to close.

324.    For most days that she worked, Plaintiff Fromer arrived before her scheduled shift and kept working after her scheduled shift to open up and close down the bar, ranging between 30 minutes to 2 hours of such time per week.

325.    Plaintiff Fromer's pre- and post-shift activities were necessary for her to

complete her duties and were performed in front of management.

326.    Plaintiff Fromer would work 10 or more hours when working a double shift.

327.    Plaintiff Fromer attended around 2-3 mandatory staff meetings, with them lasting 1-2 hours.

328.    During a week in October 2021, Defendants required Plaintiff Fromer to train for one shift while shadowing a bartender at Niagara and then one at Lovers of Today, with the shift lasting around 4 hours. This training shift occurred the week before Plaintiff Fromer was officially on the schedule and being paid. Plaintiff Fromer was not paid for the training and, accordingly, was not paid anything for that week.

329.    In 2023, Plaintiff Fromer completed her TIPS training, which took between 6 and 8 hours.

Compensation

330.    When working more than 10 hours, Defendants did not pay Plaintiff Fromer an extra hour at the minimum wage.

331.    Up until around the end of 2022, Defendants paid Plaintiff Fromer every two weeks.

332.    Defendants paid Plaintiff Fromer $10.00 per hour.

333.    Defendants did not pay Plaintiff Fromer for the mandatory staff meetings.

334.    Defendants did not pay Plaintiff Fromer for the training, nor the TIPS training.

335.    Plaintiff Fromer has not seen a poster at any of the bars advising her of a right to a minimum wage or overtime under the current laws. The only poster she saw is

extremely outdated.

336.    Plaintiff Fromer will see Defendants Jesse Malin and Joshua "Johnny T" Yerington at the bars, while she is working, and they will give her various directions on things they want done, including turning down the lights and turning up the music.

337.    Defendants, at no point, have provided Plaintiff Fromer with a Notice of Acknowledgement of Payrate and Payday.

338.    Defendants, at no point, advised Plaintiff Fromer that they were claiming a tip credit of $5.00 per hour against the minimum wage.

339.    Plaintiff Fromer's pay stubs do not state Defendants are claiming a $5.00 tip credit allowance per hour worked.

340.    Defendants did not pay Plaintiff Fromer for all hours she worked.

341.    Defendants did not pay Plaintiff Fromer for her pre- and post-shift activities.

342.    Defendants did not provide Plaintiff Fromer with an accurate wage statement under N.Y. Lab. Law § 195.3 with every wage payment.

Plaintiff Nicole Irrizarry

Duties and Work Schedules

343.    Defendants employed Plaintiff Irrizarry from October 2022 to around May 2023 as a bartender at 96 Tears, Niagara and Bowery Electric.

344.    As a bartender, Plaintiff Irrizarry's duties include taking drink orders, making the drinks, cleaning the bar, restocking the bar, organizing the bar, setting up the bar and breaking down the bar.

345.    In performing her bartender duties, Plaintiff Irrizarry's entire shift

involves performing manual labor.

346.    Plaintiff Irrizarry worked between 4 and 6 shifts per week, working Monday, Tuesday, Thursday and usually Friday to Sunday.

347.    Plaintifff Irrizarry would normally arrive at 4:00 p.m. and would leave typically at 4:00 a.m. but would sometimes leave earlier if the bar is slow.

348.    In the week before being on the calendar and before Defendants started paying her, Defendants required Plaintiff Irrizarry to participate in 2 training sessions, with each lasting around 11 hours.  Defendants did not pay her for these training sessions. This occurred during a week around October 2022.

349.    Plaintifff Irrizarry attended 3 mandatory staff meetings, with each lasting 1-1.5 hours. Defendants did not pay her for these mandatory meetings.

350.    Defendants' managers did not allow Plaintiff Irrizarry to review how much in tips she was getting paid via cash and credit cards.

351.    Plaintifff Irrizarry's manager Zoe was particularly abusive.

352.    Defendants Johnny T Yerington and Jesse Malin often visited Plaintifff Irrizarry at the various bars and would tell her what to do and how to do it and often did so in an abusive way.

<u>Compensation</u>

353.    Defendants paid Plaintifff Irrizarry $10.00 per hour.

354.    Up until around the end of 2022, Defendants paid Plaintifff Irrizarry every two weeks and then switched to paying her every week.

355.    Defendants, at no point, have provided Plaintifff Irrizarry with a Notice of Acknowledgement of Payrate and Payday.

356. Defendants, at no point, advised Plaintifff Irrizarry that they were claiming a tip credit of $5.00 per hour against the minimum wage.

357. Plaintifff Irrizarry's pay stubs do not state Defendants are claiming a $5.00 tip credit allowance per hour worked.

358. Defendants did not pay Plaintifff Irrizarry for all hours she worked.

359. Defendants did not pay Plaintifff Irrizarry for her pre- and post-shift activities.

360. Plaintifff Irrizarry did not keep all of her tips, with Defendants' management keeping some of her tips.

361. Plaintifff Irrizarry's paystubs incorrectly list her hours worked.

362. When Plaintifff Irrizarry worked more than 10 hours in a day, Defendants did not pay her an extra hour at the minimum wage.

363. Defendants did not provide Plaintiff Van Irrizarry with an accurate wage statement under N.Y. Lab. Law § 195.3 with every wage payment.

Plaintiff Julieta Winters

Duties and Work Schedule

364. Defendants have employed Plaintiff Julieta Winters since August 2022 as a bartender at their various bars, including Lovers of Today, Cabin Down Below and Niagara.

365. Plaintiffs know, from personal observations and conversations, that other bartenders, servers, barbacks and coat check attendants are/were, like them, not paid for every hour worked, paid every two weeks up until late 2022, not given the required Labor Law notices and did not get to keep all of their tips.

366.     As a bartender, Plaintiff Winters' duties include taking drink orders, making the drinks, cleaning the bar, restocking the bar, organizing the bar, setting up the bar and breaking down the bar.

367.     In performing her bartender duties, Plaintiff Winters' entire shift involves performing manual labor.

368.     Before being put on the weekly schedule, Defendants required Plaintiff Winters to attend 3 or 4 days of training, with each training session lasting between 6 and 8 hours. This occurred in a week around August 2022.

369.     Plaintiff Winters has attended 2 mandatory staff meetings, with each lasting around one hour.

370.     Plaintiff Winters works the following schedule: Wednesday, from 2:00 p.m. to 9:00 p.m.; Friday 9:00 p.m. to 3:00 a.m.; Saturday from 9:00 p.m. to 3:00 a.m.; and Sunday from 2:00 p.m. to 9:00 p.m.

371.     Plaintiff Winters often works past her shift is scheduled to attend.

372.     Plaintiff Winters would not be able to complete her bartender duties had she not kept working past her shift.

373.     Plaintiff Winters' manager (Zoe) would see her work past her scheduled shift.

374.     Plaintiff Winters clocks in and out based on when she starts and stops working.

375.     Plaintiff Winters would see Johnny T Yerington and Jesse Malin at the bars, and they would tell her what to do.

376.     Plaintiff Winters does not recall seeing any poster advising her of her right

to a minimum wage or overtime.

377.    Plaintiff Winters is sometimes asked to work a double shift, working more than 10 hours those days.

<u>Compensation</u>

378.    Defendants, up until the end of 2022, paid Plaintiff Winters every two weeks.

379.    Defendants did not pay Plaintiff Winters for the mandatory training sessions, resulting in her being paid below the statutory minimum wage that week.

380.    Defendants did not pay Plaintiff Winters for the mandatory staff meetings.

381.    Defendants, at no point, have provided Plaintiff Winters with a Notice of Acknowledgement of Payrate and Payday.

382.    Plaintiff Winters' pay stubs do not state Defendants are claiming a $5.00 tip credit allowance per hour she worked.

383.    Defendants, at no point, advised Plaintiff Winters that they were claiming a tip credit of $5.00 per hour against the minimum wage.

384.    Defendants did not pay Plaintiff Winters for all hours she worked.

385.    Defendants did not pay Plaintiff Winters for her pre- and post-shift activities.

386.    Plaintiff Winters does not recall Defendants ever providing her with the Notice of Acknowledgment of Payrate and Pay day under N.Y. Lab. Law § 195.1.

387.    Plaintiff Winters' pay stubs incorrectly list her hours worked.

388.    Defendants do not pay Plaintiff Winters spread-of-hours-pay.

CLASS ACTION ALLEGATIONS

389.   Plaintiffs assert these allegations and claims on their own and on behalf of a class of persons under Fed. R. Civ. P. 23(a), (b)(2) and (b)(3):

> All persons whom Defendants employ and have employed who are/were bartenders, servers, barbacks and coat check attendants and other comparable tipped positions at any time since October 23, 2017 (the "Class Members").

390.   The Class Members identified above are so numerous that joinder of all members is impracticable. Although the precise number of such persons is unknown, and the facts on which the calculation of that number are presently within Defendants' sole control, upon information and belief, more than 50 Class Members exist.

391.   Plaintiffs' claims are typical of the Class Members', and a class action is superior to other available methods for the fair and efficient adjudication of the controversy, particularly in the context of wage and hour litigation where individual plaintiffs lack the financial resources to vigorously prosecute a lawsuit in federal court against a corporate defendant.

392.   Defendants have acted or refused to act on grounds generally applicable to the Class Members, making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class Members.

393.   Plaintiffs are committed to pursuing this action and have retained competent counsel experienced in employment law, wage and hour law, and class action litigation.

394.   Plaintiffs have the same interest in this matter as all other Class Members and their claims are typical of Class Members'.

395.   Common questions of law and fact exist as to the Class Members that

predominate over any questions solely affecting the individual Class Members, including:

        a.      Whether Defendants employed Plaintiffs and the Class Members within the meaning of the Labor Law;

        b.      What proof of hours worked is sufficient where employers fail in their duty to maintain time records;

        c.      Whether Defendants paid Plaintiffs and the Class Members for all hours worked;

        d.      Whether Defendants gave Plaintiffs and the Class Members proper notice of the "tip credit" as 12 N.Y.C.R.R. §§ 146-1.3 and 2.2 requires;

        e.      Whether Defendants failed to provide Plaintiffs and the Class Members Notice and Acknowledgement of Payrate and Payday under N.Y. Lab. Law § 195.1;

        f.      Whether Defendants failed to provide Plaintiffs and the Class Members wages statements under Labor Law § 195.3;

        g.      Whether Defendants failed to post or keep posted a notice explaining the minimum wages and overtime pay rights provided under the Labor Law in any area where Plaintiffs and the Class Members are employed;

        h.      Whether Defendants are liable for all damages claimed hereunder, including but not limited to, interest, costs and disbursements and attorneys' fees; and

        i.      Whether Defendants should be enjoined from such violations of the Labor Law in the future.

<u>COLLECTIVE ACTION ALLEGATIONS</u>

      396.    Under 29 U.S.C. § 206, Plaintiffs seek to assert these allegations and

claims as a collective action:

> All persons whom Defendants employ and have employed who are/were bartenders, servers, barbacks and coat check attendants and other comparable tipped positions with different titles at any time since October 23, 2020 to the entry of judgment in this case (the "Collective Action Members").

397.    Plaintiffs and the Collective Action Members are similarly situated on several legal and factual issues, including:

a.      Defendants employed the Collective Action Members within the meaning of the FLSA;

b.      Collective Action Members performed similar duties;

c.      Defendants willfully or recklessly violated the FLSA;

d.      Defendants should be enjoined from such violations of the FLSA in the future; and

e.      The statute of limitations should be estopped or equitably tolled due to Defendants' statutory violations.

FIRST CAUSE OF ACTION
UNLAWFUL RETENTION OF GRATIUITIES/UNLAWFUL WAGE DEDUCTIONS
UNDER THE FLSA
(On Behalf of Plaintiffs and the Collective Action Members)

398.    Plaintiffs reallege every preceding allegation as if set forth fully herein.

399.    Plaintiffs consent, through counsel, to be parties to this action under 29 U.S.C. §216(b).

400.    Defendants employed, and/or continue to employ, Plaintiffs and the Collective Action Members within the meaning of the FLSA.

401.    As employers within the meaning of the FLSA, Jonathan Toubin, Laura McCarthy, Johnny T Yerington and Jesse Malin are personally liable for any FLSA

violations.

402.    Defendants constitute one integrated enterprise under the FLSA.

403.    Defendants willfully violated 29 U.S.C. § 203(m)(2)(B) by unlawfully retaining a portion of Plaintiffs' and Collective Action Members' gratuities.

404.    Defendants have made unlawful deductions and required kickbacks from Plaintiffs by deducting from Plaintiffs' tips that were received from customers.

405.    The deductions made from Plaintiffs' wages have not been authorized or required by law.

406.    The deductions made from Plaintiffs' wages have not been expressly authorized in writing by Plaintiffs, and have not been for their benefit.

407.    Through their knowing or intentional efforts to permit unauthorized deductions form Plaintiffs' wages, Defendants have willfully violated the FLSA. 29 U.S.C. § 206(a); 29 C.F.R. § 531.35.

408.    Defendants were aware or should have been aware that the practices described in this Complaint were unlawful, making their violations willful or reckless.

409.    Defendants have not made a good faith effort to comply with the FLSA with respect to Plaintiffs and the Collective Members' compensation.

410.    Because Defendants' violations of the FLSA have been willful, a three-year statute of limitations applies under 29 U.S.C. § 255 and should be equitably tolled between the filing of this lawsuit and when the Court conditionally certifies the collective action.

411.    Due to Defendants' violations of the FLSA, Plaintiffs and the Collective Action Members are entitled to recover from Defendants their unlawfully retained

gratuities, statutory liquidated damages, reasonable attorneys' fees, costs, and pre- and post-judgment interest and such other legal and equitable relief as this Court deems just and proper.

SECOND CAUSE OF ACTION
UNPAID MINIMUM WAGE UNDER THE FLSA
(On behalf of Plaintiffs and the Collective Action Members)

412.    Plaintiffs reallege every preceding allegation as if set forth fully herein.

413.    Defendants knowingly failed to pay Plaintiffs and the Collective Action Members the minimum wage by failing to pay them for the mandatory training and staff meetings.

414.    Defendants were required to pay Plaintiffs and the Collective Action Members for all hours worked.

415.    Because Defendants' FLSA violations were willful, a three-year statute of limitations applies under 29 U.S.C. § 255.

416.    Plaintiffs are not seeking gap time with this claim.

417.    Plaintiffs are not seeking unpaid minimum wage for the food handler's license training.

418.    Plaintiffs' FLSA claim is limited to the unpaid, mandatory training and to the extent pre- and post-shift activities reduce their hourly rate below the FLSA minimum wage.

419.    As a result of Defendants' FLSA violations, Plaintiffs and the Collective Action Members have suffered damages by being denied minimum wages in accordance with the FLSA in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other

compensations under 29 U.S.C. § 216(b), and such other legal and equitable relief as this Court deems just and proper.

THIRD CAUSE OF ACTION
FAILURE TO PAY THE MINIMUM WAGE
UNDER THE NEW YORK LABOR LAW
(On Behalf of Plaintiffs and the Class Members)

420.    Plaintiffs reallege every preceding allegation as if set forth fully herein.

421.    Defendants are "employers" under N.Y. Lab. Law §§ 190, 196-d, 651(5), 652 and supporting New York State Department of Labor Regulations and employed Plaintiffs and the Class Members.

422.    Defendants constitute one integrated enterprise under the Labor Law.

423.    As employers within the meaning of the Labor Law, Jonathan Toubin, Laura McCarthy, Johnny T Yerington and Jesse Malin are personally liable for any Labor Law violations.

424.    At all relevant times, Defendants were subject to the Minimum Wage Order for the Hospitality Industry promulgated by the New York State Department of Labor, 12 N.Y. C.R.R. Part 146

425.    The wage payment provisions of Article 6 of the Labor Law and supporting New York State Department of Labor Regulations apply to Defendants and protect Plaintiffs and the Class Members.

426.    Under the Labor Law and supporting New York State Department of Labor Regulations, Defendants were required to pay Plaintiffs and the Class Members the statutory minimum wage.

427.    Upon information and belief, Defendants failed to post, in a conspicuous place upon their premises a notice issued by the New York State Department of Labor

summarizing minimum wage provisions, violating the Labor Law and supporting New York State Department of Labor Regulations. 12 N.Y.C.R.R. §§ 137-2.3, *et seq.*

428.    Defendants paid Plaintiffs and the Class Members below the statutory minimum wage.

429.    Defendants were not eligible to take a tip credit and pay Plaintiffs and the Class Action Members below the statutory minimum wage under 12 N.Y.C.R.R. §§ 137-2.1, 2.2 and 12 N.Y.C.R.R. §§ 146-2.2, 2.9 because: (i) Defendants failed to inform Plaintiffs and the Class Action Members of the Labor Law's tip credit provisions, failing to give them the required notice; (ii) Defendants failed to pay them for all hours worked in violation of the Labor Law; and (iii) retained some of their tips.

430.    Defendants are accordingly liable to Plaintiffs and the Class Action Members for the difference between the hourly rate at which they paid them and the statutory minimum wage.

431.    Defendants willfully violated the Labor Law by knowingly and intentionally failing to pay Plaintiffs and the Class Members the minimum wage.

432.    Due to Defendants' Labor Law violations, Plaintiffs and the Class Members are entitled to recover from Defendants their unpaid wages, liquidated damages, reasonable attorneys' fees, costs, and pre- and post-judgment interest.

FOURTH CAUSE OF ACTION
OFF-THE-CLOCK WORK
UNDER THE NEW YORK LABOR LAW
(On Behalf of Plaintiffs and the Class Members)

433.    Plaintiffs reallege every preceding allegation as if set forth fully herein.

434.    Under the Labor Law and supporting New York State Department of Labor Regulations, Defendants were required to pay Plaintiffs and the Class Members 1.5

times their regular rate of pay for all hours they worked in excess of 40.

435.    Defendants failed to pay Plaintiffs and the Class Members for all of their compensable time, violating N.Y. Lab. Law § 663. This off-the-clock time includes Plaintiffs and Class Members' pre- and post-shift activities, unpaid training and unpaid staff meetings.

436.    Due to Defendants' Labor Law violations, Plaintiffs and the Class Members are entitled to recover from Defendants their unpaid wages, liquidated damages, reasonable attorneys' fees, costs, and pre- and post-judgment interest. N.Y. Lab. Law § 663.

FIFTH CAUSE OF ACTION
FAILURE TO PAY SPREAD-OF-HOURS PAY
UNDER THE NEW YORK LABOR LAW
(On Behalf of Plaintiffs and the Class Members)

437.    Plaintiffs reallege every preceding allegation as if set forth fully herein.

438.    Defendants willfully failed to pay Plaintiffs and the Class Members one additional hour's pay at the basic minimum wage rate before allowances for each day that their spread of hours exceeded ten hours, violating Part 146 § 146-1.6 of Title 12 of the Official Compilation of Codes, Rules and Regulations.

439.    By their failure to pay Plaintiffs and the Class Members spread-of-hours pay, Defendants have willfully violated the N.Y. Lab. Law Article 19, §§ 650, *et seq*. and the supporting New York State Department of Labor Regulations.

440.    Due to Defendants' Labor Law violations, Plaintiffs and the Class Members are entitled to recover from Defendants their unpaid spread-of-hours pay, liquidated damages, reasonable attorneys' fees, costs, pre- and post-judgment interest, and such other legal and equitable relief as this Court deems just and proper.

## SIXTH CAUSE OF ACTION
### FAILURE TO PROVIDE 195.1 NOTICE
### UNDER THE NEW YORK LABOR LAW
(On Behalf of Plaintiffs and the Class Members)

441.     Plaintiffs reallege every preceding allegation as if set forth fully herein.

442.     Defendants willfully failed to supply Plaintiffs and the Class Members with the required Notice and Acknowledgement of Pay Rate and Payday under N.Y. Lab. Law § 195.1(a) within 10 business days of their first employment date.

443.     Due to Defendants' violations of N.Y. Lab. Law § 195.1, Plaintiffs and the Class Members are entitled to recover from Defendants $50.00 for each workday that the violations occurred or continue to occur, or a total of $5,000.00, reasonable attorneys' fees, costs, injunctive and declaratory relief. N.Y. Lab. Law § 198(1)-b (2016).

## SEVENTH CAUSE OF ACTION
### FAILURE TO PROVIDE 195.3 WAGE STATEMENT
### UNDER THE NEW YORK LABOR LAW
(On Behalf of Plaintiffs and the Class Members)

444.     Plaintiffs reallege every preceding allegation as if set forth fully herein.

445.     Defendants have willfully failed to supply Plaintiffs and the Class Members with the required accurate wage statements with every payment of wages, violating Labor Law § 195.3.

446.     Due to Defendants' violations of Labor Law § 195.3, Plaintiffs and the Class Members are entitled to recover from Defendants $100.00 for each work week that the violations occurred or continue to occur, or a total of $5,000.00, as provided for by Labor Law § 198(1)-d, reasonable attorneys' fees, costs, injunctive and declaratory relief.

<u>EIGHTH CAUSE OF ACTION</u>
NEW YORK LABOR LAW – UNTIMELY PAID WAGES
(Brought on Behalf of Plaintiffs and the Class Members)

447.    Plaintiffs reallege every preceding allegation as if set forth fully herein.

448.    Plaintiffs and the Class Members are "manual workers" within the meaning of N.Y. Lab. Law § 190(4).

449.    As manual workers, Defendants were required to pay Plaintiffs and the Class Members "not later than seven days after the end of the week in which the wages are earned." N.Y. Lab. Law § 191(1)(a)(i).

450.    A temporary deprivation of money to which Plaintiffs and the Class Members are entitled constitutes a tangible injury that is cognizable under Article III.

451.    With Defendants paying Plaintiffs and the Class Members every 14 days, they did not pay them for the first seven days they worked during each period within seven days at the end of that week, violating N.Y. Lab. Law § 191(1)(a)(i).

452.    For violating N.Y. Lab. Law § 191(1)(a)(i), Defendants are liable to Plaintiffs and the Class Members for liquidated damages, interest and attorneys' fees and expenses. N.Y. Lab. Law § 198(1-a).

<u>NINTH CAUSE OF ACTION</u>
NEW YORK LABOR LAW – UNLAWFULLY RETAINED GRATUITIES
(Brought on Behalf of Plaintiffs and the Class Members)

453.    Plaintiffs reallege every preceding allegation as if set forth fully herein.

454.    Defendants willfully violated the N.Y. Lab. Law § 196-d by unlawfully retaining a portion of the gratuities, by unlawfully remitting them to the managers, that should be remitted to the Class Members.

455.    Due to Defendants' violations of the Labor Law, Plaintiffs and the Class

Members are entitled to recover from Defendants their unlawfully retained gratuities, statutory liquidated damages, reasonable attorneys' fees, costs, and pre- and post-judgment interest.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, on their behalf and the Class and Collective Action Members, respectfully request this Court grant the following relief:

a.      Certifying this action as a class action under Fed. R. Civ. P. 23(b)(2) and (3) on behalf of the Class Members and appointing Plaintiffs and their counsel to represent the Class Members;

b.      Designating this action as a collective action on behalf of the Collective Action Members and prompt issuance of notice under 29 U.S.C. § 216(b) to all similarly situated members of an FLSA opt-in collective action, apprising them of the pendency of this action, permitting them to assert timely FLSA claims in this action by filing individual Consents to Sue under 29 U.S.C. § 216(b) and appointing Plaintiffs and their counsel to represent the Collective Action Members and tolling of the statute of limitations;

c.      A declaratory judgment that the practices complained of herein are unlawful under the FLSA and the Labor Law;

d.      An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them, as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

e.       An award for unpaid minimum wage under the FLSA and Labor Law;

f.       An award for untimely paid wages under the Labor Law;

g.       An award for unpaid spread-of-hours pay under the Labor Law;

h.       An award for failing to provide the N.Y. Lab. Law § 195.1 Notice;

i.       An award for failing to provide the N.Y. Lab. Law § 195.3 Wage Statements;

j.       An award for unlawfully retained gratuities under the FLSA;

k.       An award of liquidated damages as a result of Defendants' Labor Law violations;

l.       An award of liquidated damages as a result of Defendants' willful FLSA violations;

m.       Equitably tolling the statute of limitations under the FLSA;

n.       An award of pre-judgment and post-judgment interest;

o.       An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

p.       Such other and further relief as this Court deems just and proper.

DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all questions of fact the First Amended Complaint raises.

Dated: New York, New York
       May 13, 2024

                    LIPSKY LOWE LLP


                    s/ Douglas B. Lipsky
                    Douglas B. Lipsky
                    420 Lexington Avenue, Suite 1830
                    New York, New York 10017-6705
                    212.392.4772
                    doug@lipskylowe.com
                    *Counsel for Plaintiffs*